FILED & ENTERED

JAN 06 2020

CLERK U.S. BANKRUPTCY COURT
Central District of California
BY fisherl    DEPUTY CLERK

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

## SAN FERNANDO VALLEY DIVISION

|  |  |
|---|---|
| In re:<br><br>Ronald Alvin Neff<br><br><br><br><br><br>Debtor(s). | Case No.: 1:11-bk-22424-GM<br><br>CHAPTER 7<br><br>**MEMORANDUM OF OPINION OVERRULING OBJECTION TO DEBTOR'S CLAIM OF EXEMPTION (dkt. 87)** |

Background

      The creditor, Donald DeNoce, was a dental patient of the Debtor, Ronald Neff, who committed medical malpractice on DeNoce. At that time Neff was addicted to pain killers and possibly had alcohol and other substance abuse issues.

      In the late 1980s, Neff was addicted to a controlled medication and also was ingesting alcohol. In 1992 he was disciplined by the Board of Dental Examiners (Dental Board) for using controlled substances, failing to keep a log of controlled substances, and improperly instructing and watching a patient. He then took part in a month-long hospital rehabilitation program for chemical dependency.

In 2006 he was in an automobile accident and then arrested (and later convicted) of reckless driving while under the influence, specifically including Xanax and Percocet.[1]

During 2005-2006 Neff obtained Vicodin, a controlled substance, by fraud, deceit, and misrepresentation, having given prescriptions to others who had them filled and returned to Neff.  In 2007 the Ventura County District Attorney filed a felony complaint against Neff for this behavior.  This was reduced to a misdemeanor on which Neff pleaded no contest and he was convicted in 2008.  He was sentenced to 75 days in jail, a $500 fine, and 36 months of probation.[2]

In November 2006, the Dental Board opened an investigation against Neff due to allegations of drug abuse. Thereafter Neff worked with Steven R. Chatoff, R.N., the executive and clinical director of Exodus Treatment Center, a drug treatment center.  At the request of Neff, Chatoff appeared as a witness before the Dental Board.  A plan was submitted as part of that hearing.  On November 21, 2017, during the evidentiary hearing in the bankruptcy court, Neff was unclear about his prior knowledge of the plan, but testified that the plan that was proposed on his behalf was never his plan, but was Nurse Chatoff's plan.[3]  However the Dental Board Report states that Nurse Chatoff developed a non-opiate treatment plan for Neff's chronic pain and psychological issues. The report further states that Neff had discussed the plan with Chatoff, but "[Chatoff] did not memorialize the treatment plan in writing.  Rather, respondent [Neff] himself prepared a written Recovery Plan" and submitted it to the Court.[4]

The plan, which was submitted to the Dental Board, suggested lifestyle and work changes requiring that Neff spend 16 hours per week socializing with friends and family and 20 hours per week working as a dentist (of which eight to ten hour would be seeing or treating patients).[5]  Chatoff testified by in 2009, Neff 'works as a dentist one day per week."[6]  In 2009 Neff's dental license was revoked.

---

[1] Ex. 8
[2] Ex. 10
[3] Court recording of hearing on 11/21/17 at 3:08 p.m. – 3:15 p.m.
[4] Ex. 8, p. 8
[5] Id.
[6] Ex. 8, p. 9

On October 1, 2008, DeNoce sued Neff in state court and obtained a judgment in early 2012 in the amount of $330,000, which is dischargeable in this bankruptcy case.[7]

Neff filed his first bankruptcy cases in March and in June 2010, both under chapter 13.[8]  He filed the current chapter 7 case on October 24, 2011.

On March 2, 2010. Neff filed an application with the Social Security Administration (SSA) for benefits due to disability.  On August 30, 2010 the SSA determined that he had become disabled on January 30, 2007 and awarded him payments beginning in March 2009 (due to the 12-month limit prior to the application).[9]

Based on that disability, Neff claimed an enhanced homestead exemption in the amount of $175,000, rather than the $75,000 that he is undisputedly entitled to.[10] DeNoce made an arrangement with the chapter 7 Trustee through which DeNoce has the authority to pursue this objection to the enhanced homestead exemption and DeNoce, who is representing himself but previously was an attorney, can keep a portion of the enhanced exemption amount.[11]

DeNoce filed an objection to the enhanced homestead exemption. (The background to this objection is set forth in the first fifteen pages of the BAP opinion and are not repeated herein.) On December 17, 2012, Judge Kaufman ruled in favor of DeNoce and held that Neff did not qualify for the heightened exemption, largely on the basis that on the date of bankruptcy he was able to work at gainful employment (the "Exemption Order").[12]  After cross-appeals, the BAP vacated and remanded in part the Exemption Order and did not rule on whether Neff should have been entitled to an evidentiary hearing.[13]

---

[7] DeNoce claim 7-1 is for $650,000 and describes a state court judgment for $330,000, which does not appear to have been final at the time that this bankruptcy was filed.  He also filed claim 8-1 for $250,000 for a state court fraudulent transfer complaint.

[8] 1:10-bk-12436-KT and 1:10-bk-17320-VK

[9] Ex. 104

[10] Cal. Code Civ. Proc. §704.730(a)(3)(B)

[11] The agreement is on the record, but not readily noticeable. I believe that DeNoce can keep $60,000.  The house has sold and the Court has allowed the Trustee to pay the undisputed $75,000 portion of the homestead exemption to the Debtor.

[12] Dkt. #147

[13] BAP CC-12-1664, CC-13-1017; remanded by the Court of Appeals as lacking finality 14-60015, 14-60016

After remand, Judge Kaufman transferred this matter to me.  I decided that an evidentiary hearing was necessary.  In preparation for this evidentiary hearing, the Court granted DeNoce extensive discovery opportunities.  Thus, he chose an expert on the issue of Neff's mental status and set a date for Neff to be examined by that expert.[14] The day before the scheduled examination, DeNoce cancelled it.  No mental or physical examination of Neff was conducted in preparation for this evidentiary hearing.

The initial evidentiary hearing was held on November 21 and 22, 2017. Neff was examined on Nov. 21 for approximately 6 hours and on Nov. 22 for approximately another 6 hours.  After that hearing, the Court issued its Memorandum of Opinion After Remand of Objection to Enhanced Homestead Exemption. The Court found that Neff would be limited to earning a gross income of $7,200 per year and thus would not have "substantial gainful employment."[15]

A large part of that opinion was based on DeNoce's failure to submit admissible evidence on key medical issues.  DeNoce filed a motion for a new trial, to alter or amend the judgment, and/or for relief from the judgment.[16]  The Court granted it in part and denied it in part, allowing DeNoce to call several doctors as witnesses. The Court also allowed DeNoce to recall Neff, stating that the "further examination of Neff will be limited to specific testimony given by the medical witnesses and will not include areas already covered in his prior examination of Neff."[17]

<u>The New Trial</u>

There were four doctors who DeNoce wished to examine or whose records he wished to introduce: Goldsmith (the examining psychiatrist for the Social Security Administration, but now deceased), Bilik (the review psychologist for the SSA), Okhovat and Hersel (Neff's treating doctors for issues of pain).  Although Hersel was not on the witness list, the Court allowed DeNoce of subpoena him.

---

[14] Dkt. #357, #364
[15] Dkt. 386
[16] Dkt. 390
[17] Dkt. 412.

1
2
3
4
5
6
7

On January 30, 2019, both Doctors Hersel and Okhovat testified and they were recalled by DeNoce for additional examination on April 11 (Okhovat) and April 15 (Hersel).  They presented voluminous records and spent hours under direct and cross-examination.[18]  DeNoce served Dr. Bilik and Dr. Goldsmith's office with subpoenae for documents.  Dr. Bilik refused to appear and the Court found that he was excused by law due to his status (in this case) under the *Touhy* regulations.[19]  No response was received as to Dr. Goldsmith's records and DeNoce never pursued them.

8
9
10
11

As part of the hearings on the Bilik subpoena, Ms. Gulseth, counsel for the government, explained the process that should be used to obtain a copy of the entire SSA file, which required the consent of Neff (since the consent he had previously given was stale) and a series of descriptions of various categories of documents.

12
13
14

At the request of the Court to be sure that DeNoce would obtain a copy of the entire SSA file, Neff agreed to sign another waiver, but then changed his mind.  No further evidence was obtained directly from the SSA or its employees or consultants.

15
16
17
18
19
20
21

Once it was determined that Dr. Bilik could not be compelled to testify, the Court allowed DeNoce to hire his own review psychiatrist for the next phase of the trial since there was an issue as to the background of the psychiatric reports and their admissibility.  The Court ordered that once this additional testimony by the review psychiatrist would be completed, either party could recall Neff, but the examination would be limited to the medical evidence obtained since the November 2017 evidentiary hearings.

22
23
24
25

On April 15, 2019 Neff filed an application to close evidence and for a final hearing.  At the hearing on May 7, 2019, DeNoce stated that he had, indeed, consulted with two mental health doctors before June 26, 2017 and that one was Dr. Sandor, who he had hired to do the psychiatric examination of Neff.  But, as described above,

26
27
28

---

[18] Ex. 21 and 23
[19] *See* dkt. 460 and related documents

DeNoce cancelled that examination prior to the November 2017 evidentiary hearing.[20] DeNoce did not identify the other doctor that he referred to.

DeNoce then stated that one of the two doctors said that he is too old to want to testify and that the other doctor did not feel qualified to do a review. Although DeNoce had earlier scheduled and then cancelled a psychiatric examination of Neff by a psychiatrist  (Dr. Sandor) who was selected by DeNoce, the Court allowed him to hire another psychiatrist to review the Goldsmith and Bilik reports.[21]

DeNoce hired Dr. Gaines on May 8, 2019, but on May 24 she withdrew, referring to some issue of bias.  At that time the Court extended the deadline to allow DeNoce to replace Dr. Gaines with a new expert.[22]

The continued trial was scheduled to begin on October 21 for up to two days, with the examination of the new expert to take place first and then argument as to which exhibits would be admitted and oral closing argument.  On October 21 DeNoce sought to call John Meyers, who is not a medical doctor and whose expertise is in reviewing submissions to the SSA for disability payments and providing expert opinion evidence that an Administrative Law Judge considers when making a disability determination. Mr. Meyers CV states that has done many vocational evaluations and  is "[h]ighly skilled and experienced in interpreting and translating medical data into earning capacity, disability, and employability."[23]

The scope of Mr. Meyers' expertise and report was laid out in detail by DeNoce in his status report filed on July 9, 2019.[24]  At the July 16 status hearing, there was discussion about what the expert would be able to review and in what areas he would be allowed to testify.  Although the report had been emailed to the Court, I stated on the record that I did not and would not read it until it was offered at the continued trial.  Mr. Kwasigroch, attorney for Neff, orally objected to Meyers as an expert and that was

---

[20] Dkt. 357 is DeNoce's motion for a mental examination of Neff.  In that motion he identifies Dr. Sandor as the one to do the examination.
[21] Dkt. 510, 527
[22] Dkt. 539, 540
[23] Ex. 35, 36.
[24] Dkt. 555

discussed.  It was made clear to all parties that Meyers would be limited to the role that

Dr. Bilik would have played.  It was absolutely clear that Mr. Meyers was not to see the

Hersel and Okhovat medical reports or the Northwestern Mutual documents since those

dealt with medical issues and not psychiatric ones.[25]

At the July 16, 2019 status conference DeNoce identified Meyers as a

replacement for Dr. Gaines.  Although he initially called him "Dr. Meyers," he later

identified him as holding a master's degree and not a medical or PhD one.  Yet, on

October 21,  in order to "get around" the Court's requirement that his expert must be a

psychiatrist (orally modified at the hearing on 10/21 to include a psychologist), DeNoce

falsely claimed that Mr. Meyers had been hired in 2017 or well before May 2019 and

was the "second doctor" referred to at the May 7, 2019 hearing.  Mr. Meyers confirmed

that he was hired in late May or early June 2019.

Because Mr. Meyers did not meet the requirements of the order, he was not

allowed to testify, but the part of his written report that is his actual analysis of the

Goldsmith and Bilik reports was admitted.  However, the Court did not allow the balance

of his report, which dealt with the ability of Neff to work as a dentist or at other jobs.

Because neither Dr. Goldsmith, Dr. Bilik, nor Mr. Meyers was aware of the medical

background of Neff or of the fact that he had lost his dental license, the balance of the

Meyers report is irrelevant to his assigned task, which was limited to the psychiatric

analysis.[26]

As more fully described below, neither DeNoce (at this point in time) nor Meyers

has the entire SSA file to review.  When dealing with the subpoena on Dr. Bilik for his

testimony and file concerning his review of the Goldsmith psychiatric report on Neff, Ms.

Gulseth, an attorney for the SSA, noted that Dr. Bilik's report (a review of Dr.

Goldsmith's report) was only one small piece of the SSA analysis and "it wouldn't rebut

---

[25] Court recording of hearing on July 16, 2019 beginning at 10:40 am, specifically starting at 10:53 am.
[26] Although Ex. 36 (Meyers' CV) was fully admitted and Ex. 35 (Meyers' Report) was partially admitted at the October 21, 2019 hearing, DeNoce lodged another copy on November 18, 2019 (dkt. 561). The Court has not and will not review this to see if it is identical to the admitted copies.

1  the determination the Social Security [sic] made because his [Bilik's] one small piece of

2  it was just that."[27]

3       Since Mr. Meyers did not have the entire SSA file to review, any opinion that he

4  might give as to the disability or earning capacity of Neff is without foundation.

5       In many ways this case revolves around the absence of the SSA records.  This is

6  attributable to errors made by DeNoce and is discussed in detail below.

7       This dispute over the homestead exemption claimed by Neff has been going on

8  for over seven years.  The basic facts are described on pages 2-15 of the opinion of the

9  Bankruptcy Appellate Panel, filed February 4, 2014 (cross-appeals CC-12-1664-KiTaD

10  and CC-13-1017-KiTaD).  Much of that is background and not specifically related to the

11  objection to the enhancement of the claim of exemption.  To the extent that the stated

12  facts are relevant, this Court finds few discrepancies as a result of the evidentiary

13  hearing.  However, one issue stated in the BAP opinion that is not supported by the

14  evidence - in that there is a lack of evidence – is  "DeNoce disputed Neff's claim of a

15  mental disability, *which was the sole basis for his SSA disability benefits,* arguing that

16  such claim was suspect."[28]  The Court cannot agree with this statement to the extent

17  that the portion in italics (italics added by the Court) is a finding rather than a contention

18  by DeNoce.  Neff testified that he had a physical examination first and then he was

19  notified by the SSA that because of his medications he should have a psychiatric

20  evaluation.  Then they determined that he was disabled for the prior four years.[29]

21       No SSA medical reports of the physical examination have been produced,

22  though the psychiatric examination ones are in evidence.  While it appears that Neff

23  gave the SSA the medical records of Doctors Hersel and/or Okhovat and perhaps the

24  Northwestern Mutual Insurance award, this is not certain since the testimony as to that

25  may be in the 2004 transcript, which is not in evidence. The only admitted SSA

26

27

28

---

[27] Court recording of hearing on 1/8/19; dkt. 516, 15:1-3
[28] BAP opinion, 10:20-22
[29] Court recording of hearing on 11/22/17 at 9:26 et seq; 9:47 et. seq

1  evidence as to the award itself is the Social Security Award Letter, which states no

2  reason for the allowance of or determination of benefits.[30]

3  　　　As noted above, at the hearing on January 8, 2019, Ms. Gulseth advised the

4  Court that the psychiatric report was only a small piece of the SSA determination.[31]

5

6  　　　　　　　　　　　　The Legal Requirements

7  　　　Neff has claimed an enhanced homestead exemption under Cal. Code Civ

8  Proc. 704.730(a)(3)(B):

9

10  　　　　(3) One hundred seventy-five thousand dollars ($175,000) if the judgment
    debtor or spouse of the judgment debtor who resides in the homestead is at the

11  　　　time of the attempted sale of the homestead any one of the following:

12  　　　… (B) A person physically or mentally disabled who as a result of that
    disability is unable to engage in substantial gainful employment. There is a

13  　　　rebuttable presumption affecting the burden of proof that a person receiving
    disability insurance benefit payments under Title II or supplemental security

14  　　　income payments under Title XVI of the federal Social Security Act satisfies the

15  　　　requirements of this paragraph as to his or her inability to engage in substantial
    gainful employment.

16

17  　　　The burden of proving that the exemptions are not properly claimed falls on the

18  objecting party.  Fed. R. Bankr. P. 4003(c).  Only after the objecting party produces

19  evidence to rebut the presumptively valid exemption does the burden shift to the debtor

20  to go forward with "unequivocal evidence" to prove that the exemption is proper.  But

21  the burden of persuasion always remains on the objecting party.[32]  Thus DeNoce is

22  required to produce evidence to rebut the presumption.  Only when he has done this is

23  Neff required to produce "unequivocal evidence" that his claim is proper.  But in

24

25

26

27  ───────────────────────
    [30] Ex. 104

28  [31] There is no indication whether Ms. Gulseth actually reviewed the SSA file or any part of it or whether this
    statement was based on the process required by the SSA, as described below.
    [32] BAP memorandum, p. 17 (citations omitted)

weighing the competing evidence, the burden to persuade the court remains on DeNoce.[33]

The word "unequivocal" is defined as "unambiguous; clear; free from uncertainty."[34]  It does not mean that it is undisputed.

There are two prongs involved in claiming an enhanced homestead exemption and DeNoce attacked the exemption on both of them:

### NEFF MUST SUFFER FROM A PHYSICAL OR MENTAL DISABILITY

Although DeNoce has concentrated on Neff's psychological condition – and it appears that this was a part of the SSA determination –the SSA also used Neff's physical condition when making its decision.  Neff testified that he first had a physical evaluation by the SSA and then he was notified that because of his medications he should have a psychiatric evaluation.[35]

Both Dr. Hersel and Dr. Okhovat were examined at length and both produced their medical records as to Neff.[36]  The most relevant dates would be the period from 2007-2010, which are the dates cited in the disability award, as well as 2011, the date that this bankruptcy case was filed.[37]  However, DeNoce contends that Neff was "malingering" so as to obtain the award and to get prescriptions for medications to support his continuing drug habit and that this can be shown by his behavior in the years following 2011.[38]

At one time, Dr. Okhovat and Dr. Hersel worked together.  They have since established separate practices – Dr. Okhovat handles Neff's ongoing pain management, but refers Neff to Dr. Hersel for surgical interventions.

---

[33] A thorough discussion of the burden of proof in opposing an enhanced homestead exemption claim in a bankruptcy case is set forth in *In re Gilman*, 544 B.R. 184 (Bankr. C.D. Ca. 2016).

[34] Black's Law Dictionary, 11th edition.

[35] Court recording of hearing on 11/22/17, 9:29 a.m.

[36] Ex. 21, 23, and 105 (which is part of ex. 21).

[37] Ex. 104

[38] The term "malingerer" is defined as a person who pretends illness, especially in order to shirk one's duty, avoid work, etc.  https://www.dictionary.com/browse/malinger?s=t

(1) Dr. Okhovat (on-going pain management)

Dr. Okhovat has seen Neff on a monthly basis, beginning in about 2006.  He testified that at first he was not aware that Neff was currently taking any addictive drugs, but he may have been aware that he had some 16 year earlier, though he did not know about Cocaine.  Had he known that Neff used recreational drugs within the last 14 years, that would have been a factor in his treatment.  Because of possible drug interactions, Dr. Okhovat would have been alarmed if he had known that Neff was "shooting up" Versed, which is a sedative and not a pain medication.  He would have had doubts about the actual need for pain medications if Neff was using all the drugs that Neff reported.[39]

Dr. Okhovat testified that the MRI showed a lot of abnormalities.[40]  While there are no disc ruptures, there is a lot of arthritis.  But pain reporting by the patient is one of the most important things in pain analysis.  Neff has been on-and-off morphine at different times and, at some point, Okhovat may have prescribed 8-10 Percocet a day.[41] He may also have prescribed Kadian, which is an abuse-deterrent morphine.[42]

Dr. Okhovat did not consider Neff to be a malingerer, but had he known of the Dental Board findings, etc., he might have had a different opinion at the time. So it is possible that Neff was malingering in 2006 just to get prescriptions.  However, because Neff reported bad pain and the MRI showed damage, Okhovot sent him to a spine surgeon (Hersel) and physical therapy.  Someone who is malingering generally would not have gone through all that, which is a painful process. As to claiming pain in order to

---

[39] Ex. 21 and 23 contain ongoing examination reports, most or all with a list of the current drugs that Neff is taking. This list changed from time-to-time as different medications were prescribed.

[40] Ex. 23, p. 156

[41] Percocet (Oxycodone and Acetaminophen) is manufactured by Endo Pharmaceuticals and they provide the following warning: PERCOCET exposes patients and other users to the risks of opioid addiction, abuse, and misuse, which can lead to overdose and death. Assess each patient's risk prior to prescribing PERCOCET, and monitor all patients regularly for the development of these behaviors and conditions.
http://www.endo.com/File%20Library/Products/Prescribing%20Information/PERCOCET_prescribing_information.html

[42] KADIAN® (morphine sulfate) Extended-Release Capsules, for oral use, CII Initial U.S. Approval: 1941 KADIAN is an opioid agonist indicated for the management of pain severe enough to require daily, around-the-clock, long-term opioid treatment and for which alternative treatment options are inadequate.
https://www.accessdata.fda.gov/drugsatfda_docs/label/2016/020616s057lbl.pdf

feed an addiction, Dr. Okhovat does not believe that this is the case since Neff has never asked for additional medications, or a higher dose, or said that he ran out of medications.

Concerning Neff's ability to work: on March 28, 2008 Dr. Okhovat signed a "To Whom It May Concern" note, which says that Neff "will be unable to practice dentistry beyond sixteen or twenty hours per weeks (sic)."[43] But he states that in his 2009 report to Northwestern Mutual, he notes that Neff could not work at all.**[44]**. Twenty hours a week would exacerbate Neff's carpal tunnel.  As to the back issues, three hours is very prolonged.  Neff was on several medications and had severe restrictions.  Maybe he could have sat for two hours at a time.  These are progressive conditions and he does not think that Neff could have worked in the jobs described in Neff's 2004 examination.[45]

During his testimony, Dr. Okhovat reviewed the various reports in his file.  In short, he testified that Neff has continued to deteriorate.  As to the forms for Northwestern Mutual, the issue was whether Neff could work full-time, not whether he could work part-time.  Therefore he was not evaluating Neff's ability to work part-time.

In summary of this testimony, Dr. Okhovat believes that Neff is suffering from the pain that he reports, but does not totally rule out that Neff is malingering.  He also finds that Neff's ability to work is restricted as to the length of time and the physical requirements.


(2) Dr. Hersel (surgical interventions)

Dr. Hersel saw Neff for surgical interventions.  Hersel testified that he also prescribed medications for Neff and, had he known of Neff's history of drug abuse, he would not have prescribed any controlled substance.  As to Versed, he never prescribed it.  It has no pain relief function and is only used in anesthesiology.

---

[43] Ex. 16
[44] Ex. 28, p. 3.  This question concerns full-time work and not any work at all.  But Okhovat does not specify whether he meant full-time or any work.
[45] Court recording of hearing on April 11, 2019, 11:53am- 12:00pm.  The testimony was directed at work as a dental assistant or an insurance claim manager.  The transcript of the 2004 examination of 8/8/11 is dkt. 413.

Although he considers Neff to be dishonest because he did not reveal the drug abuse history, Neff does have real pain issues.  The tests support his complaints.  He would not call Neff a malingerer.  Had he known about the Dental Board and the criminal matter, he would have treated Neff as a malingerer, but nonetheless, there is truth as to his pain and Dr. Hersel cannot argue about that.[46]

Percocet is an opioid as is Kadian and Tramadol.[47]


(3) Psychological Information

The only face-to-face examination was conducted by Dr. Goldsmith and is contained in his report to the SSA dated July 15, 2010.[48]  Dr. Goldsmith is deceased.  In his report, he discusses an assertion by Neff that he suffered sexual abuse by an older brother.  He also reports that Neff told him that the act which resulted in his license being suspended was "because of excessive prescription of painkiller (He states that the patient was forging his prescriptions.)."  Neff also told him that "he has not drunk or used opiates since 1989."  Dr. Goldsmith's impression was that Neff "has a history of alcohol and opiate abuse, which is currently in remission.  He is saddened about the loss of his professional standing.  He believes he could function at least part time as a dentist.[49]  He has symptoms of PTSD and ADHD, as well as depression."

Dr. Goldsmith's findings are that Neff is slightly impaired in some things and moderately impaired in others.  In short, he could perform work without special or additional supervision, but there is some impairment that might impact his performance.

It appears that the pertinent findings of the Goldsmith report were summarized on an SSA form and then sent to Dr. Bilik to provide a psychiatric review, which he

---

[46] Court recording of hearing on 1/30/19 at 10:47

[47] Tramadol is manufactured by a subsidiary of Johnson & Johnson.  Tramadol is a specific type of narcotic medicine called an opioid that is approved to treat moderate to moderately severe pain in adults. It is available under the brand names Ultram, Ultram ER, Conzip, and also as generics. Tramadol is also available in combination with the pain reliever acetaminophen under the brand name Ultracet and as generics.
https://www.fda.gov/drugs/postmarket-drug-safety-information-patients-and-providers/tramadol-information

[48] Ex. 110, also as Ex. 19F

[49] At the time that Neff made this statement, he had already lost his dental license.

completed on August 20, 2010.[50]  Dr. Bilik did not examine or meet Neff and made no independent findings.  The review seems to be in the nature of putting Dr. Goldsmith's written report into the categories needed for the SSA determination.  He noted that an "RFC" was necessary and that there was "Coexisting Nonmental Impairment(s) that Requires Referral to Another Medical Specialty."  He noted "Affective Disorders;" "Anxiety-Related Disorders;" and "Somatoform Disorders."  The Somatoform Disorder is specified as "pain," while PTSD and "HA SA – remission" is under "Substance Addiction Disorders."

As discussed above, John C. Meyers was proffered by DeNoce as an expert witness. Although the Court declined to let him testify, but did admit part of his report.[51] In his report, Mr. Meyers, who has an expertise in interpreting documents submitted to the SSA, repeated much of what was in Dr. Goldsmith's report, but clarified some of the findings. For example, because Dr. Goldsmith did not identify marked limitations, Neff would not and did not meet a medical listing.  The moderate impairments listed are noticeable, but would not prevent regular functioning.

Per Mr. Meyers, the Psychiatric Review Technique[52] is an internal form used to evaluate claims involving mental illness.  The reviewing professional was Dr. Bilik. While Dr. Goldsmith had no information other than his examination of Neff, Dr. Bilik "had the benefit of reviewing the claimant's entire claim file." This form is thus able to bring all medical information available into focus.  Summarizing Dr. Bilik's findings, Mr. Meyer reported that Dr. Bilik reached the conclusion that Neff "may manifest up to moderate functional limitations at times that could result from mental disorders.  He appears to understand, remember, and carry out simple and detailed – but perhaps not complex instructions over the course of a normal work week.  He appears able to adapt, and able to interact appropriately with others despite his mental impairments."[53]

---

[50] Ex. 19E
[51] Ex. 35, the section marked "Analysis" up through the paragraph beginning with "Dr. Bilik, the medical consultant reached the following conclusion:…."
[52]  Part of Ex. 19E
[53] Ex. 35

1

2

<u>Analysis of Neff's Physical and Mental Status</u>

3

4

The Court finds that Neff was seriously physically disabled at the time that the

bankruptcy was filed, in the years preceding and in the years following.  He is suffering

5

from a degenerative condition and - although the relevant time period ended in 2011 on

6

the filing of this bankruptcy case - there is no possibility of substantial improvement.

7

8

The Court finds the testimony of Neff as to his physical condition to be credible.

This is bolstered by the testimony of Doctors Okhovat and Hersel, who are his treating

9

physicians.  The treatment for extreme and continuing pain has gone on for years.

10

While Neff reports periodic lessening of the pain as different medications are tried, there

11

is never a time when he is pain-free – at least not for a meaningful duration.  DeNoce

12

raised issues about whether Neff was malingering by claiming pain that does not exist,

13

solely to obtain SSA benefits or to collect on the Northwestern Mutual insurance policy

14

or to acquire drugs to which he is addicted.  However, the Court finds the testimony of

15

Dr. Okhovat to be the most persuasive.  Neff does not require larger doses, report that

16

he has run out of prescribed drugs, or ask for additional medications, all of which would

17

be signs of claiming pain merely or mostly to support a drug habit.

18

19

It is clear that Neff is still on addictive drugs (opioids), but these are prescribed

for pain.  (As discussed below, under certain circumstance this is not a disqualifying

20

situation to SSI benefits).  It is also clear that Neff has a history of drug abuse and of

21

criminal behavior in "feeding that abuse."  He is a recovering alcoholic and there is no

22

guarantee that he will remain sober, but there is no evidence that he has started

23

drinking during the relevant timeframe.  The Court notes that at times Neff was less than

24

candid with his doctors such as failing to advise them of his substance abuse and illegal

25

acts or misrepresenting to Dr. Goldsmith that Neff was not in a scheme to obtain drugs

26

through prescriptions that he wrote.  As to his lack of disclosure of the sexual abuse,

27

there was no reason for him to have advised the pain management doctors of this

28

psychological issue.

1

## AS A RESULT OF THAT DISABILITY, NEFF MUST BE UNABLE TO ENGAGE IN

2

## SUBSTANTIAL GAINFUL EMPLOYMENT

3

As noted by the BAP, the existence of a disability is only one of two prongs to

4

claim the enhanced exemption under California law:

5

6

7

8

CCP § 704.730(a)(3)(B) sets forth a two-part test to determine if a debtor is eligible for the disability exemption: the debtor must (1) have a physical or mental disability; and (2) as a result of that disability, be unable to engage in substantial gainful employment.[54]

9

Thus the other major issue here is whether, on the date of this bankruptcy

10

petition, Neff was capable of "substantial gainful employment."

11

The presumption created by the SSA award falls under Fed. R .Evid. 301.  In the

12

context of a patent case, the D.C. Circuit described the effect of a "bursting bubble"

13

presumption:

14

15

16

17

18

19

20

21

22

23

24

25

26

27

As finally adopted after much scholarly debate, Rule 301 embodies what is known as the "bursting bubble" theory of presumptions. Under this theory, a presumption is not merely rebuttable but completely vanishes upon the introduction of evidence sufficient to support a finding of the nonexistence of the presumed fact. *See Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 254–55, 101 S. Ct. 1089, 1094–95, 67 L.Ed.2d 207 (1980); *Del Vecchio v. Bowers,* 296 U.S. 280, 286–87, 56 S. Ct. 190, 193–94, 80 L. Ed. 229 (1935). In other words, the evidence must be sufficient to put the existence of a presumed fact into genuine dispute. The presumption compels the production of this minimum quantum of evidence from the party against whom it operates, nothing more. *Burdine,* 450 U.S. at 255 n. 8, 101 S. Ct. at 1094 n. 8 ("The word 'presumption' properly used refers only to a device for allocating the production burden.") (quoting Fleming James, Jr. & Geoffrey C. Hazard, Jr., *Civil Procedure* § 7.9, at 255 (2d ed.1977) (footnote omitted)). In sum, a presumption is not evidence. If the patentee presents a sufficiency of evidence which, if believed, would preclude a directed finding in favor of the infringer, the presumption evaporates and the accused infringer is left to its proof. That is, the accused infringer would then have to satisfy its burden of persuasion with actual evidence. *See Del Vecchio,* 296 U.S. at 286, 56 S. Ct. at 193 (presumption of accidental

28

---

[54] BAP opinion, 21:21-26

1
2
death "falls out of case" with proffer of testimony sufficient to justify a finding of suicide). 10 *Moore's, supra,* § 301.04.

3
4
5
*A.C. Aukerman Co. v. R.L. Chaides Constr. Co.,* 960 F.2d 1020, 1037-38 (Fed. Cir. 1992) (en banc), *abrogated on other grounds*, *SCA Hygiene Products Aktiebolag, et al., v. First Quality Baby Products, LLC et al*., 137 S. Ct. 954 (2017).

6
7
8
9
10
Because the SSA has awarded disability benefits to Neff, there are two approaches that DeNoce can take to overcome the SSA presumption: (1) show that the SSA determination of the Neff claim was incorrectly decided under the law and thus it cannot create a presumption or (2) show that even if the SSA met its legal requirements, Neff is actually able to engage in substantial gainful employment.

11

12
### The Social Security Administration Procedures

13
14
15
The Social Security Act as set out in 42 U.S.C. § 423 provides the legal basis for awarding disability payments.  The regulations in 20 C.F.R. § 404.1 et seq control the actual process used to determine if an individual qualifies for disability payments.[55]

16
17
18
19
Section 404.1505(a) notifies the claimant that to meet the definition of a disability, there must be a severe impairment(s) that makes the claimant unable to do his/her past relevant work or any other substantially gainful work that exists in the national economy, as mandated by Congress:

20
21
22
23
24
25
26
27
   (3)(A) Except as provided in subparagraph (C), an individual shall be considered to be disabled for purposes of this subchapter if he is unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months.
   (B) For purposes of subparagraph (A), an individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of

28

---

[55] Unlike many government regulations, these are written in plain English and are directed to the claimant.

whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work. For purposes of the preceding sentence (with respect to any individual), "work which exists in the national economy" means work which exists in significant numbers either in the region where such individual lives or in several regions of the country.

42 U.S.C. § 1382c. Thus, if the individual cannot do his prior work, an assessment will look at the claimant's vocational factors of age, education, and work experience to determine if s/he can do other substantial gainful work.  The definition of "substantial gainful activity" used by the SSA is as follows:

> Substantial gainful activity is work activity that is both substantial and gainful:
> (a) Substantial work activity. Substantial work activity is work activity that involves doing significant physical or mental activities. Your work may be substantial even if it is done on a part-time basis or if you do less, get paid less, or have less responsibility than when you worked before.
> (b) Gainful work activity. Gainful work activity is work activity that you do for pay or profit. Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized.
> (c) Some other activities. Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities, or social programs to be substantial gainful activity.

20 C.F.R. § 416.972.

> Section 404.1520 describes the five-step sequential evaluation process:
> (1) Current work activity – if claimant is doing substantial gainful activity, s/he is not disabled.
> (2) Medical severity of the impairment must meet the duration requirements or s/he is not disabled.
> (3) Medical severity meets one of the listings in appendix 1 and meets the duration requirements, if so, s/he is disabled.
> (4) Residual functional capacity of past relevant work is considered and if the claimant can still do his/her past relevant work, s/he is not disabled.
> (5) The assessment of residual function, age, education, and work experience are considered to see if the claimant can make an adjustment to other work. If the adjustment can be made, the claimant is not disabled.  If claimant cannot make the adjustment to other work, s/he is disabled.

In determining when an impairment is not one listed in appendix 1, the SSA uses all relevant medical and other evidence in the case record to decide if this meets the requirements at step 3.  Section 404.1529 describes the process used to evaluate symptoms, including pain.  When it comes to pain, the SSA reviews all statements, reports, medical evidence including the medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant.  The SSA then determines whether these are consistent with the other evidence.  There must be laboratory findings and medical signs to corroborate the pain.  As part of the process, a medical or psychological consultant may provide an advisory assessment to assist the disability hearing officer in determining whether the impairments could reasonably be expected to produce the alleged symptoms.[56]  Once they decide that this occurs, then the SSA will evaluate intensity and persistence of the pain to see how it limits the claimant's capacity to work.  The process and order of steps is then set forth.

Because Neff had a drug addiction and is still on prescription opioids, Section 404.1535 applies.  It requires that there be a determination of whether the drug addiction (or alcoholism) is a contributing factor material to the determination of disability.  If the claimant would still be found disabled if s/he stopped using drugs or alcohol, then it is not a contributing factor.  If it is a contributing factor, the claimant can move forward by enrolling in an appropriate treatment facility and making progress under a treatment plan. Section 404.1536.

As to vocational background, § 404.1560 requires the SSA to look at past relevant work (done within the prior 15 years) and determine whether the claimant can still do it.  If so, the issues of age, education, and work experience will not be considered – otherwise they will be.  The SSA may use a vocational expert to provide information about the physical and mental demands of the past vocational work.  If the claimant cannot do his/her past relevant work, the SSA will decide whether s/he can adjust to other work by looking at the residual functional capacity as well as the

---

[56] This may or may not have been the reason for the Goldsmith psychiatric evaluation.

vocational factors of age, education, and work experience.  Because the award went back to 2007, when Neff was still licensed to practice dentistry, it is not certain whether the SSA applied this when it was actually reviewing his application after he had lost his license.

In Neff's case. age is the most relevant of the three vocational factors.   Section 404.1563.  Neff was born January 11, 1951.  At the time of the SSI determination (in 2010), he was 59 years old. They consider someone age 55 or older to be in the category of "advanced age."  The rules for one of "advanced age" are set forth in section 404.1568(d)(4).  Because Neff's skill set is appropriate for sedentary or "light" work, that does not apply to him.

Another factor is "work which exists in the national economy."  20 C.F.R. §404.1566.  The SSA does not consider whether it is in the immediate area in which the claimant lives, whether there is a specific job vacancy that exists for the claimant, or whether the claimant would be hired if they applied for work.  The SSA merely looks at whether there are sufficient jobs having requirements that the claimant can meet with his/her physical and mental abilities and vocational qualifications.

In this case, there is no specific evidence of the findings of the SSA.  However, since Neff was awarded disability payments, the SSA had to have found that Neff could not engage in "substantial gainful activity."

In his trial brief[57] DeNoce relies on the case of *In re Rostler*, 169 B.R. 408, 413 (Bankr. C.D. Cal. 1994), for the proposition that "substantial gainful employment" does not require "that Debtor generate sufficient income for support for her to be considered gainfully employed. Rather, the relevant inquiry is whether she was engaged in a business that normally results in pay or profit."  The BAP also deals with *Rostler*, but with a different result.

The BAP uses the word "substantial" as a modifier of both "gainful employment" and as a modifier of "gainful."  It holds that not all work necessarily meets the definition

---

[57] Dkt. #378

of "substantial" or "gainful" employment.  Because "substantial" also modifies the term

"gainful," there is a suggestion that "the debtor must be physically, mentally and

emotionally able to work enough hours, at a high enough net wage, to contribute

materially to his or her support.  BAP at 21 (citing to *In re Morris*, 2010 WL 9485973, at

*4 (Bankr. E.D. Cal. Oct. 7, 2010)).

> Based on this, the test propounded by the BAP is as follows:

> As the objecting party, DeNoce was required to rebut the presumption that, <u>as of the petition date</u>, Neff was unable to engage in "substantial gainful employment" — i.e., that he had the ability to perform meaningful mental or physical work-related activity, in a competitive or self-employed position, which normally results in pay or profit, and that Neff was physically, mentally and emotionally able to work enough hours, at a high enough net wage, to contribute materially to his support.  Neff's level of disability, whether only "partial" or "full," does not control the outcome of whether he is eligible for a disability homestead exemption.  The pertinent question is whether his disability rendered him unable to engage in substantial gainful employment at the time he filed the Third Bankruptcy Case.[58]

DeNoce also relied on Neff's prior statements of his desire to work and his

qualifications to be employed in October 2011, when he filed this bankruptcy case.  It is

clear that he wanted to continue to work as a dentist one or two days a week in 2009

and even more in 2007.  When he lost his license, he became much more limited.  He

testified that he cannot be a dental hygienist without a license to do so.  He can work as

a dental assistant, if anyone would hire him.  He testified to shakiness and a lack of fine

motor coordination, which the Court finds would eliminate work as a dental assistant.

While he has the knowledge to review claims for a dental insurance company, there is

no evidence that this would meet the requirement of "national employment" or that he

would be hired to do so.  Further, his physical limitations would make him even less

desirable in the employment market. Finding employment is doubtful given his age and

---

[58] BAP opinion 21:6-18 (emphasis in the original).

the fact that he continues to use high doses of drugs that may be impairing his physical and mental abilities.[59]

DeNoce brought in no third-party witnesses as to Neff's possibility of employment or the amount that he could earn.[60]  Neff gave the sole testimony on these subjects.[61] He testified that a dental assistant and office manager in 2010 could make $15 per hour and, on a full-time basis, would receive about $30,000 per year.[62]  In the initial argument on November 22, 2017, both sides state that Neff could function as a dental assistant about 40 hours per month (for DeNoce this is a minimum and for Neff this is a maximum). This would be a gross salary of $600 per month.  If he could work as a claims analyst, presumably he would receive a higher hourly wage and, although no one argued this, he could appear to be able to work more hours per week since this is done sitting down rather than standing up.  But there is no evidence as to the salary or his chances of obtaining such employment.

Beyond his possible earnings as a dental assistant, Neff also received insurance payments from Northwestern Mutual under two policies: D421679 (overhead expense insurance) and D421664 (income replacement).  The overhead expense insurance policy had a two-year duration.  It is unclear how long the income replacement policy was or would be in effect.  There is also no evidence that the terms of this policy were not revealed to the SSA prior to the decision by that agency. Under the income replacement policy, Neff received approximately $2,300 per month.[63]

The SSI award was $1,922 per month.  DeNoce has argued that there is an issue of whether this is a determination of only a partial disability rather than a full one.

---

[59] The Court is aware that the test of the actuality of finding work is limited in the SSA determination, but still finds it relevant as to the overall picture of Neff's situation in 2011, particularly since DeNoce argued that such work was available, had Neff merely sought it.

[60] Meyers' report calculated an earning capacity of $46,000+. But even if this part had been admitted into evidence, Meyers was not aware of Neff's loss of his dental license, criminal conviction, history of drug abuse, and current physical condition. Ex. 35.

[61] It should be noted that DeNoce could have introduced a variety of governmental or organizational reports that would have given figures for average salaries in various occupations, etc. in 2010 or even today.  He did not do so.

[62] This appears to be a gross salary and not a net after-tax salary.

[63] Ex. 19(A), p. 109.

It appears that the SSA has no discretion as to the amount to be paid to the claimant. It is the amount that the claimant would be entitled to if s/he had claimed regular social security payments beginning at 62.[64]

<u>Social Security Administration Records</u>

Obtaining the SSA records has been a major issue in this case. It appears that during discovery Neff produced copies of all documents concerning his disability claims. On July 29, 2011, as part of a ruling on a 2004 examination of Neff in his chapter 13 case, Judge Kaufman ordered that Neff produce the following:

1. Any and all documents or records, of any nature, including medical records, and reports or records of any healthcare providers, concerning the Debtor's disability, for the last 5 years.
2. Any and all documents concerning or related to any disability insurance claims the Debtor made within the last 5 years. These documents are to include, but are not limited to, applications, claim documentation, insurance claims forms, letters, or the like by and or between the Debtor and the insurance company.
3. Any and all documents concerning applications for, or reflecting benefits for social security disability, to include any documentation between the Debtor and the social security administration, claims forms, applications for benefits, benefits paid, or the like for the last 5 years.[65]

The documents that Neff produced are attached as exhibit 2 to the transcript volume III of the 2004 examination taken on August 8, 2011.[66]  Largely they consist of documents concerning the claim to Northwestern Mutual.  The psychiatric documents prepared for the SSA are also included.  Since the transcript of the 2004 examination is not in evidence, the Court will not read it to see if Neff testified that this was all the documents provided to the SSA.  At a later date, he produced the SSA Disability Award

---

[64] 42 U.S.C. §423(a)(2).

[65] 1:10-bk-17320-VK, dkt. 213.

[66] Dkt. 413.  This has been lodged, but is not in evidence.  Apparently DeNoce knew that these were what Neff provided to the SSA.  Dkt. 516, 23:10-14.  DeNoce: "I have some of the medical reports. I think I've got medical reports that preexisted his claim to SSA which SSA somehow obtained and then relied on. I have some of the basic, but I don't -- whatever the piece parts are for the SSA decision, that category I kind of don't have."

1   dated August 30, 2010.  The Court is not aware of any SSA documents in Neff's

2   possession that were not produced and has confidence that DeNoce carefully sought

3   any necessary orders to fill in the gaps.

4      To attack the SSA determination, DeNoce wanted access to the records held by

5   the Social Security Administration (SSA) concerning Neff's physical and mental

6   condition, especially the ones that the SSA used to base its decision to grant Neff

7   disability benefits.  He also wanted something from the SSA that would show the basis

8   of the calculation of the amount of the disability benefits.  Initially DeNoce sought this by

9   subpoena.  His specific request for documents is a follows:

11      Please provide the following disability records concerning the above individual:

12      Any and all records or reports regarding the disability determination
13      for Ronald A. Neff. These records are to include, but are not limited
14      to: medical records, test records, determination records, psychiatric
        records, records reflecting physical disability, mental disability, or
15      any other alleged condition regarding alleged disability. These
        records are also to include any records from third parties
16      concerning alleged disabilities, including but not limited to those
17      from any physician, healthcare provider, hospital, psychiatrist,
        therapist, or doctor, including Canyon Medical Group, or Dr. William
18      Goldsmith.

19      These records are to include all records used in making the
20      determination to award disability benefits to Ronald A. Neff, including
21      any such determination.[67]

23      A few months later it became clear that the SSA file could not be obtained by

24   subpoena, but that Neff would have to sign a waiver (the terms "waiver" and "release"

     are both used in this memorandum, but refer to the same document).  Neff agreed, but

25   only on condition that the materials obtained be confidential and limited to Neff and his

26   experts. A dispute occurred as to whether this would be a confidentiality agreement or a

_____
[67] Dkt. 308

protective order and the language to be used.  Neff signed the waiver once there was a court-ordered confidentiality agreement.[68]

DeNoce prepared the waiver on the proper government form.  He checked the box for "Complete medical records from my claims folder(s)."  There is also a checked box above Neff's signature for "Other record(s) from my file."  The form states that "You must specify other records: e.g., consultative exams, award/denial notices, benefit applications, appeals, questionnaires, doctor reports, determinations."  Here DeNoce filled in "Please see attached." This is all above the signature line.  Attached is a sheet on which is written:

No.8 Other Records From my File to be Released:
1) Questionnaires and disability and work history and daily activity reports submitted by and signed by a claimant;
2) Medical evidence;
3) Consultative examination reports;
4) Consultants assessments (vocational and medical);
5) SSA's disability determination/decision;
6) Dr. William Goldsmith report of 7-15-10 from Canyon Medical Group
8) All reports/evaluations of Harvey Bilik, Psy.d[69]

As he stated in his declaration filed on June 26, 2017, DeNoce received the executed release on March 29, 2017.   He made an appointment with the SSA for April 17, 2017 and met with Claims Representative Ms. Arcia at that time.  She took the signed release and said that "she would have to forward the whole thing to her supervisor, Kyle Goodwin."  When Goodwin failed to contact DeNoce, DeNoce started calling him every other day.  After a few weeks Goodwin told DeNoce that "he would need to send the whole thing to legal for approval,"  Again there were delays with DeNoce calling Goodwin twice a week and leaving detailed messages. "Finally, Mr.

---

[68] Dkt. ##329, 332, 339, 342, 348 and the various filings related to these.  As with everything else in this case, there was a great deal of back-and-forth, delays, finger pointing, and argument.  But this was as to the terms of the confidentiality agreement and not of the language on the waiver.

[69] Dkt. 519, p. 66-68.  This is an unsigned copy, but appears to be what Neff signed and DeNoce presented to the SSA.  Item 7 is missing in the original.

1  Goodwin contacted me, and set an appointment for me to come in and obtain the

2  records on June 5, 2017, which I did."[70]

3       DeNoce then went on to advise the Court:

4

5       After finally obtaining the SSA records on June 5th, Declarant promptly
        called his consultants to schedule an appointment, give them the records, get

6       signed Confidentiality Agreement, etc.  One was out of town on vacation and
        Declarant expects to meet with that Dr. Shortly [sic].

7       Declarant was given an appointment date of June 21st to meet with his

8       other consultant.  He did so and after he signed the Confidentiality Agreement,
        gave him the records to review.  That was last Thursday.  Declarant expects to

9       hear back from him regarding his review and recommendations/opinions, etc.

10      Declarant anticipates that one or both of his consultants will want to
        examine Debtor Neff after they have completed their review.[71]

11

12      A month later, on July 27, 2017, DeNoce filed a unilateral status report in which

13  he stated:

14      The present posture of this case is that the written discovery is now
        completed.

15      Further, the Social Security Administration ("SSA") disability records of the

16      Debtor have now been obtained, after much delay by the SSA.  They were only
        provided on June 5, 2017.  The herculean efforts to obtain them is a matter of

17      record.

18      Creditor has now met with his consultant, reviewed those records, and is
        ready to move forward to the medical evaluation of debtor's disability claim.

19      Creditor has now concurrently filed a Motion for a Mental examination, set for
        hearing on September 19, 2017.[72]

20

21      At a hearing at some time between July 27, 2017 and November 22, 2017,

22  DeNoce told the Court a totally different story.  He said that he went to the SSA office,

23  requested the file, and was given a disc of the records, which he took and reviewed.  He

24  stated that he found that the material was incomplete.  He then destroyed the disc and

25  neither sent it to Kwasigroch nor sought instruction from the Court.  At this time I cannot

26

27  _____

28  [70] Dkt. 354, p. 3-4
    [71] Dkt. 354, 4:19-5:2
    [72] Dkt. 360, p. 4

find that exact colloquy, but on November 22, 2017 – the second day of trial – DeNoce stated that "I got a couple of office file notes."[73] This directly contradicts his prior filed statements of having a group of records that he passed on to his experts and his lack of assertion that the file he received was incomplete.

DeNoce obtained the SSA disc of the records on June 5, 2017.  Since DeNoce was intensely interested in the basis of the SSA determination of disability, had there been only office file notes or irrelevant papers in the SSA production, it is inconceivable that DeNoce would not immediately have contacted Mr. Goodwin and demanded additional documents.  On June 26, three weeks after the production, DeNoce never said anything about an incomplete production or that records were missing.  Rather, he waited at least a month after his June 26 declaration and at least a minimum of two months after he received the SSA disc to state that the production was incomplete and he only made that statement to justify the fact that he had not turned over copies to Kwasigroch, thus asserting that he had destroyed the disc.

It was DeNoce's decision to destroy the SSA records.  If he believed that the SSA did not give him the full file, he had options at that time, but he failed to invoke them.  Obviously DeNoce had plenty of time to review the SSA documents and if he has destroyed them, it was an intentional act and cannot now be undone.

This issue arose again in conjunction with the hearing on the Motion to Quash the subpoena as to Dr. Bilik.  The initial colloquy occurred on January 8, 2019 with Geralyn Gulseth, Special Assistant United States Attorney.  At the hearing on February 12, 2019, Elan Levey, Assistant United States Attorney on behalf of the Social Security Administration, stated that she recently sent DeNoce a blank release form and a list of documents usually included in an SSA file.  At the hearing she said that to obtain documents, there must be an itemized list above Neff's signature on the release and that the list could not merely be an attachment so that it is clear what documents Neff is agreeing to have turned over. Apparently the consent for release form that Ms. Gulseth

---

[73] Court recording of hearing on of 11/22/17, 3:39 pm and following

referred to had limited space for itemization, so DeNoce said that he would need four forms to cover everything.[74]

DeNoce then argued that he had not received the documents that he requested from the SSA because he did not properly specify what he needed. It is possible that the consent for release of information form prepared by DeNoce and signed by Neff may or may not have given DeNoce access to the entire file.  Ms. Gulseth stated in her email that she would have to consult with the SSA Custodian of Records to see how or if she would "honor" the general consent that was previously given.[75]  In the case of the initial release, Mr. Goodwin consulted with legal counsel and then released the file without further comment or objection.

We don't know exactly what DeNoce received in his initial request, but it certainly was more than just the few "office file notes."[76]  Given his interactions with SSA personnel, it is probable that he received everything he requested or at least a substantial amount of those documents.  The Court does not find credible DeNoce's statement in his opposition to the application to terminate evidence that "he got no records, a mish-mash from a busy clerk at a window with no certification."[77]

It is a mystery as to why DeNoce acted as he did, why he destroyed the disc, and if he did not obtain a full production why he failed to immediately seek the balance.  But since he is the one with the burden of proof and he has denied himself that proof (or the ability to rebut the presumption from the SSA's own records), the Court need not speculate on his reasons

Once Ms. Gulseth raised the issue of whether the initial release was sufficient, Neff's counsel said that Neff would sign a new release (the old one having become stale through the passage of time).  Neff then changed his mind.  He was not bound by his prior statement as DeNoce has not relied on it to his detriment.  DeNoce's

---

[74] A copy of the email to which she was referring is on Dkt. 519, p. 62; hearing on 1/8/19, dkt. 516, pp. 24-27; hearing on 2/12/19, dkt. 499, p. 18 et seq.

[75] Dkt. 525 contains an email exchange between DeNoce and Gulseth as to what consents are needed to make sure that the entire file is released.

[76] Court recording of hearing on 11/22/17, 3:39 pm and following

[77] Dkt. 519, 17:25-28

arguments of reliance deal only with procedural information that he learned as part of the attempt to subpoena Dr. Bilik, which was over a year after the initial SSA production and after the trial was complete except for the ruling on the motion for new trial.  The time for general discovery of the SSA files had long since passed.

.

### The Social Security Administration Determination

On about August 30, 2010 the SSA determined that Neff became disabled on January 30, 2007, but because he did not file for benefits until March 2, 2010, the SSA awarded Neff $1,922 per month from March 2009.[78]  Because this creates a rebuttable presumption in favor the enhanced exemption, DeNoce bears the burden of overcoming the SSA ruling.  One way would be to demonstrate that Neff was not actually disabled in 2011 and, presumably fooled the SSA.  This is discussed above.  The other way would be to show by clear evidence that the SSA did not properly discharge its duties when it found that Neff was entitled to disability benefits.  This included both the necessary physical and mental problems, but also that he could not engage in substantial gainful employment.

Although usually applied in the context of criminal actions brought by the government, the general rule is that "in the absence of clear evidence to the contrary, courts presume that they [government employees] have properly discharged their official duties." *United States v. Armstrong*, 517 U.S. 456, 464 (1996) quoting *United States v. Chemical Found., Inc.,* 272 U.S. 1, 14–15 (1926).  This same proposition is also cited in *Bracy v. Gramley*, 520 U.S. 899, 909 (1997).

A factual situation somewhat close to the one before this court in that it deals with private individuals who may have been hired by the SSA is the case of *Pasadena Research Labs., Inc. v. United States*, 169 F.2d 375 (9th Cir. 1948).  Although also in a criminal context, the issue was whether adulterated and misbranded drugs shipped into interstate commerce had been tampered with while in the possession of the government

---

[78] Ex. 104.  The March 2009 date was based on the date that Neff filed his claim, not the date that he was found to qualify for benefits.

and its employees.  Citing to *Chemical Foundation*, the court found that the presumption

of official regularity applied to the methods used by the government employees and also

to private individuals: "This presumption that even private individuals do their duty and

exercise due care should apply *a fortiori* to doctors and nurses, whose professional

training and traditions teach them to be meticulous in the handling of preparations that

are to be administered to their patients."  *Id.* at 382.


Credibility

In reviewing the BAP opinion, it is clear that Judge Kaufman had little belief in the

credibility of Neff based on his previous actions concerning the transfer of property

during the chapter 13 case and his failure to immediately claim the enhanced

homestead exemption.  In the present hearing and the motions leading up to it, DeNoce

largely focused on Neff's credibility.  And this, or course, is something that the Court

must consider.

Neff's testimony has been consistent with his prior statements.  He described his

physical and mental issues in similar fashion to his June 17, 2011 testimony.[79]  The

Court must look to the testimony of Neff, his doctors, and those documents that are in

evidence. Neff admitted that he takes a substantial number of restricted drugs and

medications on a daily basis.  This did not seem to impair his memory or testimony.

Several times he described his physical and mental impairments and the Court believes

that these are accurate.

DeNoce accuses Neff of being a liar and Judge Kaufman had found that Neff

lacked credibility.  There is no doubt that Neff has acted improperly in the bankruptcy

case and also did not provide certain information to his examining doctors, as noted

above.  He failed to disclose the truth of his legal troubles or the extent of the illegal acts

that he took to feed his drug habit.  Neff may be the biggest liar in the world – although

the Court does not find this to be the case – but that does not absolve DeNoce of his

---

[79] For a summary of that testimony, see BAP opinion, page 8.

burden to produce evidence of error by the SSA or error or wrongdoing by the examining doctors.

DeNoce continues to argue that DeNoce's lawyer, Michael Kwasigroch, does not act in good faith.  Kwasigroch has every right to vigorously defend his client and to change his position and arguments as needed as the case progresses.  DeNoce has also shifted to new grounds, etc. as he saw fit.

And DeNoce himself is a liar.  One clear example was the incident with Meyers where DeNoce not only said that he had hired Meyers years before he did, but also that Meyers had a PhD (calling him Dr. Meyers), which he did not, and which was clear from Meyers' signature on his report.  And the various stories that DeNoce concocted concerning the SSA records that he received has severely damaged his credibility.

Both of Neff and DeNoce are flawed and are engaged in a continuous struggle.  But that does not mean that Neff is insufficiently damaged to qualify for disability or that he is capable of earning a reasonable income and meeting the requirement of being able to participate in "substantial gainful employment."

.

## SUMMARY

The burden of proof concerning a claim of exemption is on the objecting party.  In the case of a presumption, the objecting party must produce sufficient evidence to rebut the presumption.  Because this is an objection to a claim of exemption, even if DeNoce produces that evidence, he still has the burden of persuasion. Fed. R. Evid. 301; Fed. R. Bankr. P. 4003(c).

The proof of disability completely favors Neff.  The testimony of his treating physicians, along with their records, shows that he was physically disabled in 2011, for years before that, and that the disability will continue and perhaps increase in the years to come.  There is some evidence of Neff's mental disability, but if that were the only basis of his claim, it would not be enough.  However, the evidence of his physical

impairments alone meets the first requirement of Cal. Code Civ. Proc.
§704.730(a)(3)(B).

It is possible that the evidence supporting DeNoce's position actually exists, but DeNoce was unable to obtain it due to his own errors. When DeNoce obtained the SSA file he made two irreversible errors: first, he did not come to court and seek additional documents from the SSA and second, he destroyed what he had been given.  Months later when he asserted that he had not received the most crucial documents showing the basis of the SSA determination, there was no way to know whether he had received these or not.  The evidence was gone.  And his months of silence tend toward a finding that he had received everything and that it was not beneficial and therefore he destroyed it. So all that was left to him was to try to prove that Neff has fooled all of his doctors and done so for years.  This is a difficult task, particularly since Doctors Hersel and Okhovat have treated Neff on a regular basis for many years.    DeNoce keeps arguing that Neff is a drug addict, which was certainly true in the past.  Neff takes many drugs, and this includes a daily dose of addictive drugs, but these are through a doctor's prescription and are not considered in denying a disability claim by the SSA even if Neff is addicted to them.[80]

As to the issue of "substantial gainful employment," DeNoce must first overcome the presumption created by the SSA award.  This is of the type identified as a "bursting bubble presumption."  DeNoce had to produce sufficient evidence to support a finding that the SSA did not do its job, so that the finding by it of the disability or of the inability to engage in substantial gainful activity was invalid.  He has not done so.  Even if he had presented such evidence so as to "burst" the presumption, DeNoce would still have the burden of introducing evidence that Neff was, in 2011, capable of obtaining "substantial gainful employment."  Once again, DeNoce did not meet this standard.

---

[80] Griffith v. Colvin, 192 Soc. Sec. Rep. Serv. 540, 2013 WL 3936517, at *4 (W.D. Wash. 2013). The DAA does not include "addiction to, or use of, prescription medications taken as prescribed, including methadone and narcotic pain medications."  SSR 13-2P (S.S.A.), 2013 WL 621536, at *3 [Docket No. SSA-2012-0006] SOCIAL SECURITY RULING, SSR 13-2P.; TITLES II AND XVI: EVALUATING CASES INVOLVING DRUG ADDICTION AND ALCOHOLISM (DAA) SSR 13-02P February 20, 2013

As noted above, the Court does not have evidence of whether Neff was continuing to receive the Northwestern Mutual Insurance income replacement payments once he obtained the SSA benefits, or whether these would be put into the calculation of "substantial gainful employment" or "substantial gainful activity."  As to the federal standard, it appears that the SSA did not think so because it apparently awarded him his full age 62 social security benefit of about $1,922 per month even though he was also receiving insurance payments from Northwestern Mutual. However, the Court cannot speculate and take this income into account given the lack of evidence.

Ignoring these sources of outside income, which were not from "employment" in any event, leaves only Neff's potential income of $600 from 40 hours of dental assistance work each month.    An earned income of some $600 per month would not prevent Neff from meeting the requirement under California law.[81]  Gross earnings of $7,200 per year for an individual simply cannot be determined to be "substantial gainful employment."

Furthermore, if the SSA provides disability payments there is a presumption that the recipient cannot qualify for substantial gainful employment.  The reason for this is that the SSA process is long and contains many safeguards against fraud.  While the SSA process is not infallible and the presumption is therefore rebuttable, DeNoce has failed to rebut it.

## RULING

The Court finds that the evidence supports a finding that Neff is physically disabled.  The Court further finds that DeNoce has not overcome the presumption under Cal. Civ. Proc. Code § 704.730(a)(3)(B) that Neff is unable to engage in substantial gainful employment.  The Court further finds that even if the presumption did not exist, the evidence shows that Neff is unable to engage in substantial gainful employment.

---

[81] There is some discussion in cases throughout the country as to the interaction of state disability exemption law with federal bankruptcy law. The BAP opinion never raises this and it is not part of any published California decision or opinion within the Ninth Circuit.  Therefore it is not dealt with in this memorandum.

Although these findings continue at this time, they were equally true from 2007 through 2010 (the time period of the SSA finding) and in 2011 at the time that this bankruptcy case was filed.

###

Date: January 6, 2020

_____
Geraldine Mund
United States Bankruptcy Judge